UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 07 CR 438 |
| v. ) | |
| ) | Honorable Virginia M. Kendall |
| MARIANO ORTIZ ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Mariano Ortiz ("Ortiz") moves this Court to quash his July 11, 2007 arrest and to suppress evidence obtained as a result of that arrest. For the reasons stated herein, Ortiz's motion to quash and suppress is denied.

**BACKGROUND**

Between July 9, 2007 and July 11, 2007, an undercover Drug Enforcement Administration ("DEA") agent (the "UC") and a confidential source (the "CS") engaged in conversations with co-defendant Jarbaree Williams ("Williams") wherein the UC and Williams arranged for Williams to purchase narcotics. Williams, who resided in Michigan, and the UC ultimately agreed that Williams would drive to Chicago on July 11, 2007 to acquire the controlled substances. During these conversations, Williams informed the UC that he needed the UC to provide him with a driver to transport the purchased narcotics to Michigan in a separate vehicle. Williams was assured that this could be arranged. In addition, Williams and the UC discussed the need for a payment plan, as Williams would not have all the buy money prior to July 11. During one of these conversations, Williams informed the UC that he was working with a partner who would provide $25,000 of the total agreed upon down payment of $75,000. On the evening of July 10, however, Williams informed the UC that his partner had backed out of the deal and would not put up the $25,000. Subsequently, Williams called the UC again and indicated that another partner would be willing to

put up the money. At no time, did Williams identify either partner or tell the UC that either partner would come to Chicago.

On July 11, 2007, the date of the agreed upon transaction, the UC contacted Williams at 8:41 a.m. to confirm that Williams still intended to drive to Chicago. Williams informed the UC that he would call him when he was near the agreed upon location. At various times throughout his journey, Williams maintained phone contact with the UC, updating him as to his location and asking for directions. During these conversations, Williams also informed the UC that he was driving a black Dodge Magnum, that he would be arriving via Interstate 80, and the approximate time of his arrival. Based on this information, DEA agents surveilled the appropriate exit off of Interstate 80. At approximately 3:10 p.m., Williams called the UC and informed the UC that he was exiting the interstate at Harlem Avenue. After the phone call, the UC informed the other DEA agents that he could hear another individual's voice in Williams's car. At approximately 3:13 p.m., DEA agents observed a black Dodge Magnum and a white GMC Jimmy in close proximity exit Interstate 80 and head north on Harlem Avenue. Williams had not previously told the UC that he would be traveling to Chicago with another person or vehicle.

Approximately two minutes later, at 3:15 p.m., DEA agents observed the Dodge Magnum driven by Williams arrive at the agreed upon hotel parking lot, followed by the white GMC Jimmy driven by Ortiz. At the time, Deandre Johnson ("Johnson") was sitting in the passenger seat of Williams's vehicle. Williams parked his car to the west of the UC's vehicle. Ortiz pulled his vehicle in front of Williams's vehicle, approximately two spots away from the UC's vehicle. Williams's vehicle faced north and Ortiz's vehicle faced south. The DEA agents never saw or heard Williams and Ortiz communicate with one another.

2

Williams and the UC then exited their respective vehicles and began to discuss the details of the narcotics transaction. During a recorded conversation, the UC inquired as to whether Williams still needed a driver to transport the narcotics to Michigan and indicated that he could provide Williams with a driver. Williams answered in the affirmative and further stated: "I got . . . it's me and my . . . that's both . . . that's my other truck right there too . . . he followed me down here too." The UC and Williams then discussed the prices and quantities of the narcotics. Later in the conversation, the UC asked Williams to see the buy money. According to Ortiz, Williams then showed the UC a black bag in the trunk of his vehicle and indicated that the bag contained a portion of the money. Williams then pointed to the white GMC Jimmy driven by Ortiz and indicated, "the rest is in there."[1] Williams did not indicate that Ortiz himself possessed the buy money or that Ortiz knew the money was in his vehicle. In addition, the DEA agents had not seen Ortiz and Williams communicate, nor did they have actual knowledge regarding whether the SUV contained a portion of the buy money.

Shortly after observing the money in Williams's car, the UC gave the prearranged takedown signal to the other agents. The DEA agents then arrested Williams outside the vehicle. The UC then yelled to the agents to get the white truck. The DEA agents ordered Ortiz out of the GMC Jimmy and immediately arrested him. Subsequently, the DEA agent recovered $20,000 of United States

---

[1] According to Government, when discussing the buy money, Williams stated: "I got 55 in here and 20 in that truck right there." Williams indicated that he was speaking of the white GMC Jimmy when verbally referencing the other truck. Ortiz did not subsequently deny that he made such a statement in his reply memorandum. Instead, he incorporated his previous recitation of the events by reference and admitted that Williams alerted the UC as to the presence of buy money in the white GMC Jimmy. (Def. Reply 2-3.)

Ortiz's vague account of this conversation is not inherently in conflict with the Government's more specific version of the events, and, therefore, does not create a dispute. Further, even if the Court were to characterize these allegations as in dispute, the dispute would not be material. As discussed in detail above, assuming Ortiz's vague account of this conversation, the arresting agents still possessed sufficient information for a determination of probable cause. Thus, the Court will assume Ortiz's account of this portion of the discussion for the purposes of the instant motion.

3

currency from the center console of the GMC Jimmy and two cell phones from Ortiz. The agents did not arrest Johnson, who remained in the passenger seat of Williams's vehicle, was privy to Williams' conversations with the UC, and had access to a gun subsequently found in Williams's car. After the arrests of Williams and Ortiz, both men confessed that Ortiz had followed Williams from Michigan with the intent to assist and participate in the purchase of narcotics by, among other things, holding part of the buy money in his vehicle in case of any troubles with the police while en route to the Chicago area.

## DISCUSSION

The Fourth Amendment protects against unreasonable arrests. *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). "For a warrantless arrest to be reasonable, law enforcement agents must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the agents reasonably believed that the suspect had committed or was committing a crime." *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). While mere suspicion will not sustain a finding of probable cause, probable cause "need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (internal quotations omitted). Instead, "probable cause requires only a substantial chance of criminal activity." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). Under this standard, a police officer may rely on his experience and training to draw reasonable inferences from the facts presented. *Funches*, 327 F.3d at 586. Ultimately, "[p]robable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

Ortiz first argues that this Court must hold an evidentiary hearing to resolve this issue. "'Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion.'" *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) (quoting *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998)). A difference of facts is considered material "'only if the disputed fact makes a difference in the outcome.'" *Id.* (*quoting United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). In this case, an evidentiary hearing is unnecessary, as the allegations set forth in the moving papers do not present a disputed issue of fact that would affect the outcome of the motion. To be sure, the recitation of the facts set forth above comprise all factual allegations submitted by Ortiz in his initial motion and memorandum, subsequently admitted to by Ortiz in his reply memorandum, or contained in the Government's written submission but not subsequently contested by Ortiz. To the extent that the parties' allegations differed, the Court adopted Ortiz's version of the events. Thus, because the DEA agents had probable cause to arrest Ortiz even under Ortiz's account of the events from July 9, 2007 through July 11, 2007, Ortiz's request for an evidentiary hearing is denied. *See id.*

Relying on *United States v. Ingrao*, 897 F.2d 860 (7th Cir. 1990), Ortiz also argues that his warrantless arrest was not supported by probable cause because, at the time of his arrest, the agents had no knowledge that Ortiz was engaged in criminal wrongdoing or was in any way connected to Williams. In *Ingrao*, the Seventh Circuit concluded that law enforcement authorities did not have probable cause to arrest the defendant, Angelo Ingrao ("Ingrao"), because the arrest was supported only by physical proximity. 897 F.2d at 863-64. Specifically, agents observed Ingrao emerging

5

from a gangway used by a suspected drug trafficker while carrying a gym bag. *Id.* at 863. The gangway was shared by at least two houses, one of which belonged to the suspected drug trafficker, but the arresting agents could not see which home Ingrao exited from. *Id.* The arresting agents had no other information regarding Ingrao prior to his arrest; "[o]ther than using the same walkway as that used by [the known drug trafficker] and the unknown man, there remain[ed] no connection between Ingrao and any of the alleged criminal activities." *Id.* at 863. Concluding that this walkway connection was insufficient to support probable cause, the *Ingrao* court noted: "'to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown.'" *Id.* at 864 (*quoting United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984)).

Unlike the arresting agents in *Ingrao*, the DEA agents in the instant case had far more evidence than mere physical proximity or association with Williams to establish the requisite connection between Ortiz and the criminal activity. Significantly, Williams, on the day of the purported drug transaction and while under the impression that he was speaking with a drug dealer, twice identified the white GMC Jimmy that Ortiz was driving as being with him; he did so after he indicated that he needed a driver to transport the narcotics and again when explaining that the remaining buy money was located in the vehicle driven by Ortiz. Despite Ortiz's arguments to the contrary, these two identifications, combined with the information learned through the DEA agents' surveillance prior to and on the date of the agreed upon transaction, were sufficient to establish probable cause. First, during one of the multiple conversations between Williams and the UC, Williams told the UC that he had a partner who would provide one-third of the down payment. Subsequently, on July 11, 2007, after Williams informed the UC that he was exiting on Harlem

6

Avenue, the DEA agents observed Williams's black Dodge Magnum exit on Harlem Avenue, followed by the white GMC Jimmy driven by Ortiz in close proximity. Two minutes later, the agents observed Williams enter the agreed upon location, followed once again by the white GMC Jimmy driven by Ortiz. When Williams parked to the west of the UC's vehicle, Ortiz parked approximately two spots away from the UC's vehicle and facing Williams's vehicle. While Ortiz subsequently remained in the car, Williams told the UC: "that's my other truck right there too . . . he followed me down here too." Subsequently, when the UC asked to see the buy money, Williams indicated that the remaining portion of the buy money was in the white GMC Jimmy, or, as the UC had previously been told, Williams's "other truck" that followed him from Michigan. Thus, while neither physical proximity or mere association with an individual engaged in criminal activity will establish probable cause, these facts, known to the DEA agents prior to Ortiz's arrest, were sufficient to establish "a substantial chance [that Ortiz was involved in] criminal activity." *See Schaafsma*, 318 F.3d at 722 (probable cause to arrest existed where the undercover agent met with the defendant's accomplice in a parking lot for a purported drug deal, the accomplice previously indicated during negotiations that "his 'guy'" would be getting the drugs, the accomplice identified the defendant, who was sitting in a separate car in the parking lot, as "his 'guy'" through words and gestures, and the defendant attempted to flee when his accomplice was arrested); *United States v. Lima*, 819 F.2d 687, 689-90 (7th Cir. 1987) (probable cause to arrest existed where a drug sale had been arranged with another arrestee, the defendant's car was parked behind the arrestee at the scene of the drug transaction at 11:00 p.m., there were no other cars in the immediate vicinity at the scene of the drug transaction, and a man from the arrestee's car walked over to the defendant's car and made contact with him while the transaction was taking place).

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that, viewing the totality of circumstances surrounding this purported transaction, probable cause existed to arrest Ortiz on July 11, 2007. As such, the Court denies Ortiz's motion to quash his arrest. Furthermore, because the evidence at issue was seized by way of this lawful arrest and, therefore, is not fruit of the poisonous tree, *compare Ingrao*, 897 F.3d at 866, Ortiz's motion to suppress evidence is also denied.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   September 16, 2008